## IN THE UNITED STATES DISTRICT COURT
## FOR THE STATE OF COLORADO

**Civil Action No. 1:17-cv-01124-PAB-MLC**

THE ESTATE OF ANGEL GOODWIN, et al

      PLAINTIFFS,

v.

MONICA CONNELL, et al

      DEFENDANTS.

---

## PLAINTIFFS' RESPONSE TO COUNTY DEFENDANTS' MOTION TO DISMISS

---

Plaintiffs, through counsel, respond to County Defendants' Motion to Dismiss Second Amended Complaint ("SAC") (Doc. #70) ("MTD") as follows:

## I.  INTRODUCTION AND SUMMARY OF FACTS

Angel Goodwin, a gravely disabled child, drowned in the bathtub while his grandmother was passed out on drugs. Angel and his siblings had been removed from their parents and placed with their grandmother, Onesia Najera, by Jefferson County in 2005. SAC ¶26. There were over 50 complaints of Ms. Najera's abuse by family members, neighbors, teachers, and others lodged with human services agencies around Denver, all of whom shared a centralized complaint system accessible by each county. After Angel died, Jefferson County Human Services noted that:

> There have been fifty-one prior reports of concern for lack of supervision, substance use, domestic violence, medical neglect, physical abuse, educational neglect and environmental neglect … There is a pattern of reports in which she is not caring for the children that were left in her care and leaving them alone for periods of time and using various illegal substances.

> Ms. Najera frequently 'jurisdiction hopped' to avoid having the children taken away.

SAC, ¶ 34.  At the end of 2014, Ms. Najera moved back to Jefferson County. Both the Police Department and Human Services ("JHS") immediately began receiving serious complaints of abuse. SAC pp. 9-32. Ms. Connell was the lead investigator and received complaints from teachers, police, family members and the children that Ms. Najera was physically abusive, left them alone in the house, starved them, locked Angel in a dark closet, left Angel alone in his own feces, did drugs in front of the children and was prostituting herself. SAC pp. 9-32.

Ms. Connell oversaw multiple 3-day "high risk assessment" complaints. SAC ¶69, 43-47. Despite Colorado regulatory requirements to complete these investigations within 60 days, she engaged in procedural manipulations to avoid complying with this timeline designed to protect at risk children. When she received a new complaint, she closed her current investigation and opened a new one, triggering a new 60-day time line.

During this time, Ms. Connell concluded that she would file a Dependency and Neglect Action ("D&N"), which would have resulted in an immediate judicial hearing regarding removal of the children, if Ms. Najera did not complete a drug analysis. Ms. Najera repeatedly flagrantly refused to provide a urine sample within the designated time frame, yet Ms. Connell chose not to file a D&N, hid all her information from the Court, and instead opened a new investigation upon receipt of another serious complaint by the school teacher. Ms. Connell assured and misled schoolteachers and police officers into thinking appropriate action was being taken on behalf of these children, cutting off aid. Each of these procedural manipulations was specifically ratified by Jefferson County decision-makers as being "in framework". SAC ¶¶73-67, 79-84, 136-141.

As a result of these intentional procedural manipulations ratified by Jefferson County, Ms. Connell's "investigation" remained "open" indefinitely, no one else continued to act on

these children's behalf, falsely believing it was being handled by JHS, and Angel drowned in the bathtub while Ms. Najera took drugs, over 5 months after Ms. Connell became lead investigator.

## II.  MONICA CONNELL IS NOT ENTITLED TO QUALIFIED IMMUNITY

A. Monica Connell Violated Angel's Constitutional Right.

To violate the Tenth Circuit's state created danger doctrine, a government worker must affirmatively act to increase a plaintiff's vulnerability to danger from private violence and satisfy the following elements:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*T.D. v. Patton*, 868 F.3d 1209, 1222 (10th Cir. 2017) (Petition for rehearing denied) *citing Currier v. Doran*, 242 F.3d 905, 921 (10th Cir. 2001). Defendant Connell's conduct meets all of these factors, as evaluated below.[1]

1. Monica Connell affirmatively acted to create or increase Angel's vulnerability to the danger and put Plaintiff at substantial risk of serious, immediate, and proximate harm.

Ms. Connell's conduct meets the first and third elements of the state created danger test. Ms. Connell did not merely negligently fail to investigate -- she engaged in purposeful manipulations of the complaint system to avoid protective regulatory deadlines and the requirement that she institute a D&N. These investigations didn't close or restart automatically; Ms. Connell had to write up a conclusion, affirmatively close the matter, and open a new one. Ms. Connell also received multiple complaints from various sources and told them she was

---

[1] Defendants do not contest that Angel was part of a limited and specifically definable group.

conducting an investigation, discouraging them from their own protective actions.

By allowing Ms. Najera to refuse drug testing, repeatedly elongating the investigatory period, misleading others that she was acting on their complaints, and stopping required judicial intervention, Ms. Connell increased his vulnerability to danger. Judicial intervention would have removed Angel, but instead she left him with and emboldened Ms. Najera to continue her abuse.

The Tenth Circuit has expressly held this type of caseworker affirmative conduct to be actionable. *T.D.*, 868 F.3d 1209; *Currier*, 242 F.3d 905. The fact that Angel had been living with Ms. Najera prior to Ms. Connell's involvement in no way relieves her of liability, contrary to Defendants' contention. MTD, p. 7. This Circuit has consistently made clear that *increasing vulnerability* to danger with affirmative conduct *at any point* satisfies the state created danger test. *T.D.*, 868 F.3d at 1233 ("In short, conduct relevant to danger creation depends on affirmative conduct, which can occur before and after a parent obtains legal custody of a child.").

In *Currier*, Caseworker Medina engaged in affirmative conduct when she instructed the mother of abused children to stop reporting abuse, because "her behavior allegedly discouraged Juarez from seeking the help of other CYF employees or other governmental sources of help such as the police." 242 F.3d at 922. Thus, while the caseworker was not responsible for placing the children in the father's dangerous home, she still acted affirmatively and "increased the children's vulnerability" to danger by discouraging reports and cutting off other aid thereafter.

Similarly, Angel was more vulnerable to harm because Ms. Connell improperly elongated the investigatory period for at risk children and cut off other sources of aid. Other people trying to help, including Westminster Police, Carl Blesch and Kayla Birkhead, were discouraged from acting because Ms. Connell told them she was "investigating" when in fact she

was delaying, even while she herself had concluded that the Court needed to remove the children pending a drug test.[2]  Misleading these other sources of aid into believing that an adequate timely investigation was underway "increased [Angel's] vulnerability to the danger" because it cut off private sources of aid, "removing what would otherwise be safety valves."  *Kuyper v. Bd. of Cty. Commissioners of Weld Cty., Colo.*, No. CIV09-CV00342PABMEH, 2010 WL 1287534, at *7 (D. Colo. Mar. 30, 2010) quoting *Currier,* 242 F.3d at 922.

In *T.D.*, the caseworker's failure to disclose known instances of abuse to the court after custody was awarded was itself an affirmative act that increased the danger to the child. 868 F.3d at 1227-28. Similarly here, Connell "did not merely 'stand by and do nothing when suspicious circumstances dictated a more active role for her.' She acted affirmatively." 868 F.3d at 1226 citing *DeShaney v. Winnebago Cnty. Dept.of Soc. Serv.*, 489 U.S 189, 203 (1989). Angel was left with Ms. Najera because Ms. Connell withheld information from the court and "contributed to [grandmother] retaining temporary physical and legal custody over" Angel. *Id.*

2.  Monica Connell acted recklessly in conscious disregard of the known obvious risk.

Ms. Connell's conduct meets the fourth and fifth elements of the test. She received numerous serious complaints of abuse from family members, neighbors, schoolteachers, police, and the children themselves. Not only was she aware of abuse, she was also specifically told about the methods Ms. Najera would use to avoid government and judicial intervention. Ms. Fresquez, Ms. Najera's niece who had been living with her to help with the children, told Ms. Connell that she found Angel crying in the dark in a filthy diaper and that Ms. Najera was so

---

[2] The fact that some of the sources of potential aid that Ms. Connell's actions "tended to foreclose was from a state source rather than a private source is not constitutionally significant." *Currier*, 242 F.3d at 922.

high on pills that she couldn't get up. Ms. Fresquez told her that Ms. Najera brags about manipulating JHS workers and avoiding drug tests. SAC ¶¶109-118.

In a recorded conversation between Ms. Connell and Detective Ells, they discussed how embarrassing it would be to read about this situation in the news, given the 50+ prior complaints against Ms. Najera. A tearful teacher, Kayla Birkhead, begged Detective Ells to act, stating that she was afraid Angel would die.  Detective Ells told Ms. Birkhead "I wish I had the right to just yank him right now, but I really can't do that you know what I mean." Relying on Ms. Connell to meaningfully and timely act, she told Ms. Birkhead that "[t]hese are big investigations." Detective Ells said she would try to get social services (meaning Ms. Connell) to try to make Ms. Najera take a drug test. SAC ¶166-172. These risks were known, obvious and discussed. Detective Ells and Ms. Birkhead deferred to Ms. Connell because of these workers misperception that these were "big investigations", when in fact Ms. Connell was just manipulating the system to avoid removing the children.

Ms. Connell's awareness of this risk is amply shown in her many notes that Ms. Najera is suspected of doing meth and abusing the children, rates these complaints as High Risk Assessments, as well as her admission that Ms. Najera would need to submit to a urine screen or a D&N action would be filed in order for "risk" to be mitigated.[3]

3. <u>Ms. Connell's conduct, when viewed in total, is conscience shocking</u>.

Ms. Connell's alleged conduct "significantly exceeded 'ordinary negligence' or

---

[3] Defendants erroneously argue that Ms. Connell can't be liable because "the only knowledge she had consisted of *reports of allegations* by third parties." MTD, p. 8. Not only is this false (she herself witnessed that his ribs were protruding and that there was no food in the house, SAC ¶104), the case law does not require that social workers formally conclude that abuse occurred. In *Currier* and *T.D.* reports of abuse, like these, made the risk known and obvious.

'permitting unreasonable risks' and rose to 'a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.'" *T.D.*, 868 F.3d at 1230, quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1184 (10th Cir. 2002).

Ms. Connell discouraged others by pretending to be conducting a legitimate investigation. She took five months to investigate complaints that had to be completed in 60 days, leaving children in known danger and in the face of ever mounting evidence that they were being seriously physically abused. Certainly it must at least be said that Ms. Connell's conduct, "could be conscience shocking, depending on further context as provided by discovery." *Currier*, 242 F.3d at 922.[4] As in this Court's decision in *Kuyper*, "on a motion to dismiss the relevant question is whether the complaint alleges facts that 'could be conscience shocking, depending, of course, on further context provided by discovery.'" 2010 WL 1287534 at *9, quoting *Currier,* 242 F.3d at 920. There is no "reasoned justification or policy consideration that would support" Ms. Connell's conduct and "plaintiffs have 'a reasonable likelihood for mustering factual support for [their] due process claim based on the danger creation theory.'" *Id.*

B. Angel Goodwin's Rights Were Clearly Established.

Defendant Connell violated Angel Goodwin's clearly established Fourteenth Amendment rights. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001). "For a right to be

---

[4] *Kuyper*, 2010 WL 1287534 at *9 (conscience shocking facts pled where "Flores and Schwabe affirmatively lied to the Kuypers in order to ease the placement of a child with a history of sexual misconduct in the Kuypers' home."); *Briggs v. Oklahoma*, 472 F. Supp. 2d 1294, 1303(W.D. Okla. 2007); *Armijo*, 159 F.3d 1253, 1264 (10th Cir. 1998) (school officials' decision to send home a potentially suicidal student when it was known there were firearms present in the house and that his parents were not home, "possibly could be construed as conscience-shocking".)

clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent." *Pauly v. White,* 874 F.3d 1197, 1222 (10th Cir. 2017). Plaintiffs are not required to find cases that precisely mirror the exact situation Ms. Connell confronted – "defendants are required to make reasonable applications of the prevailing law to their own circumstances." *Currier*, 242 F.3d at 923. Courts do not have to "engage in 'a scavenger hunt for prior cases with precisely the same facts' but examine 'whether the law put official on fair notice that the described conduct was unconstitutional.'" *Tenorio v. Pitzer*, 802 F.3d 1160, 1163-64 (10th Cir 2015).

The Tenth Circuit has made clear that a case worker's "affirmative[] acts to create, or increase a plaintiff's vulnerability to, danger form private violence," violate clearly established law, regardless of the timing of those acts with respect to custody. *Currier*, 242 F. 3d at 923; *T.D.*, 868 F.3d at 1225 and fn 22 (holding "affirmative conduct after placement of a child can support a danger creation claim" and "the timing of the custody was not the critical factor in *Currier* ... [i]nstead, we looked to whether and when there were "affirmative actions.")[5] Just like Ms. Patton, Ms. Connell also knowingly withheld and "did not disclose" critical information from the court that would have caused children to be removed.[6] *T.D.*, 868 F.3d at 1226-7. Just like Ms. Medina*, Ms. Connell also cut off sources of aid. *Currier*, 242 F.3d at 921.

Unable to distinguish these cases, Defendants instead argue there is no case "that establishes liability under the state-created danger theory when there were no affirmative bad

---

[5] While *T.D.* was announced after the conduct here, the Tenth Circuit found that conduct to be clearly established as unlawful as of 2009-2011, well before the conduct here.

[6] As this Court has stated*: "It is worthy of note that *Currier* also deals, at least in part, with the failure to provide information to those who were charged with protecting the victimized child— in that case, the Children's Court. *Currier,* 242 F.3d at 919." *Kuyper*, 2010 WL 1287534, at *10.

acts." MTD, p. 10. Plaintiffs have alleged affirmative acts and Courts do not accept Defendants' unfavorable presentation of the facts during the clearly established inquiry. Like Ms. Patton, a reasonable social worker would know after *Currier* that this conduct violated Plaintiff's rights.

### III.   THE WRONGFUL DEATH CLAIM IS NOT BARRED BY THE CGIA

In *Martinez v Estate of BLE*, 379 P.3d 315 (Colo. 2016), the Supreme Court declared it unnecessary to identify a "single definition of willful or wanton conduct" because its prior reasoning derives from a well articulated "common feature", "namely a conscious disregard of the danger."  *Id.* at 323.  It did not engraft an "evil" motive requirement. MTD, p. 11.

Thus, the relevant question is whether it is plausibly alleged that Ms. Connell actions and omissions[7] were not "merely negligent" but "exhibited a conscious disregard of the danger". The SAC is replete with specific allegations of Ms. Connell's conscious disregard of the dangers posed to Angel Goodwin, dangers that were directly reported to her in detail from multiple sources. Ms. Connell repeatedly documented these horrifying reports for months but then consciously disregarded such danger until Angel died.  See SAC ¶¶ 54-200.

Plaintiffs have not alleged mere negligence. The SAC clearly demonstrates Defendant Connell engaged in purposeful procedural manipulations to piggy back one investigation on another to avoid statutory timelines, "in the face of her knowledge of the obviousness of the serious risk to Angel and the other children was reckless and in conscious disregard of the risk." See SAC ¶¶ 6, 8, 84, 179, 183-188, 289-298, 332. While Plaintiffs do not fully portrait the numerous examples of willful and wanton conduct due to space, the SAC is replete with allegations that she consciously disregarded serious dangers as the lives of children hung in the

---

[7] Willful and wanton conduct includes both acts *and omissions*.  § 24-10-118 (1)(a) and (2) (a).

balance.

If this Court has any hesitation in finding willful and wanton acts and omissions, Plaintiffs ask that the Court defer ruling, permit "any discovery necessary to decide the issue of sovereign immunity" under 24-1-0-118 (2.5) and hold an evidentiary hearing as appropriate.[8]

### IV.   COUNTY DEFENDANTS ARE LIABLE UNDER 42 U.S.C. § 1983

A.  Defendants Have Unconstitutional Customs and Ratified This Conduct.

A municipality may be held liable for constitutional violations caused by *inter alia*, "an informal custom amounting to a widespread practice that … is so permanent and well settled as to constitute a custom or usage with the force of law," or "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

1.  Unconstitutional Custom, Policy, or Practice.

An informal custom is established by demonstrating that the constitutional violation was caused by "a widespread practice that … is so permanent and well settled as to constitute a custom or usage with the force of law." *Bryson*, 627 F.3d 784. To hold an entity liable for a custom or practice, a plaintiff must allege (1) the existence of a continuing widespread practice of unconstitutional conduct by employees, (2) deliberate indifference or tacit approval of such misconduct, after notice and (3) that the custom was a moving force in the injury. *Rodriguez v. Chavez*, No. 12-CV-01071-PAB-MJW, 2014 WL 4627274, at *5 (D. Colo. Sept. 16, 2014).

Defendants' custom allowed investigations to go on long beyond the regulatory

---

[8] Plaintiffs are in the process of preparing documentary discovery requests. As soon as responses are received, Plaintiffs wish to depose Ms. Connell before having an evidentiary hearing.

protective period. Ms. Connell's approach was blessed as "completed and in framework" by management. As such, the entity tacitly approved this approach and was deliberately indifferent because they were on notice that it allowed an end run around the protective period specifically designed to protect children in High Risk complaints. See SAC ¶¶42-50.  The regulation puts this entity on "notice" that routinely allowing investigations to be artificially prolonged risked serious harm to children and was "substantially certain to result in a constitutional violation". *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

Ms. Connell twice asked for supervisor approval of such procedure.  In doing so, she was very open in following this deliberately indifferent custom. She specifically listed the complaints of abuse, risks to Angel, lack of compliance with drug testing, her conclusion a D&N was required and her plan to instead continue investigating instead of filing this action. See SAC ¶¶ 136, 140-141 and 156-158. That this procedure was specifically twice approved as "in framework" evinces a custom. *Ortega v. Denver*, 944 F. Supp. 2d 1033, 1039 (D. Colo. 2013). This custom, which lessens the workload of Jefferson County at the expense of at-risk children, caused the injury by increasing Angel's vulnerability and ultimately caused his death.

Defendants' citation to cases about single incident liability is misplaced.[9]  Plaintiffs do not rely on the fact that Angel Goodwin died or that Ms. Connell's decisions prove a custom. Instead, Plaintiffs allege that the supervisor approval of a repeated approach as "in framework" is

---

[9] Defendants cite to inapposite cases. In *City of Oklahoma City v. Tuttle*, 471 US 808 (1985), the Supreme Court held that juries cannot infer entity action simply from one incident of excessive force. In *Montoya v. Bd. of County Com'rs*, 506 F.Supp 2d 434 (D. Colo. 2007), Plaintiff failed to even allege that the constitutional violation was pursuant to any custom or policy. Here, the SAC gives fair notice of the specific facts giving rise to entity liability; it is not just "a boilerplate recitation of the grounds for municipal liability," but rather contains additional, specific facts as required. *Thomas v. City of Galveston,* 800 F. Supp. 2d 826, 844-45 (S.D. Tex. 2011).

evidence that Jefferson County has a *framework* that dictates this exact action.[10]

Moreover, Plaintiffs should be allowed to conduct discovery into this plausibly alleged theory of entity liability. Pre discovery and "[i]In the context of municipal liability, as opposed to individual . . . liability, it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures." *Thomas*, 800 F. Supp. 2d at 842.

The Trails documents discussing Jefferson County's "framework" are confidential and Plaintiffs have no access to other Trails pre-discovery.[11] Discovery will likely show other examples of this custom or that employees may be trained on such framework. The Complaint's allegations regarding the entity defendants' policies, customs, and training raise a plausible inference of an official policy or custom for liability under § 1983. *Bryson*, 627 F.3d at 788.

2.  <u>Jefferson County Ratified Defendant Connell's Unconstitutional Conduct</u>.

Ratification exists where "a subordinate's position is subject to review by the municipality's authorized policymakers," and those policymakers "approve a subordinate's decision and the basis for it." *Moss v. Kemp,* 559 F.3d 1155, 1169 (10th Cir. 2009). In her reports, she fully laid out the bases for her conclusion that a D&N procedure was required, and her decision to instead artificially prolong the period for investigation. County decision makers twice approved this affirmative decision, concluding that it was "in framework." SAC ¶¶188-189.

---

[10] That a caseworker may be acting pursuant to instruction or policy does not relieve them of liability for their danger creating conduct.  See, e.g., *T.D.*, 868 at 1235.

[11] For this reason, "[p]laintiffs need not point to a specific, articulated municipal policy in order to withstand [a] motion to dismiss. An official policy or custom may be inferred from a complaint's allegations." *Starstead v. Superior*, 533 F. Supp. 1365, 1369 (W.D. Wis. 1982).

Jefferson County's ratification, which specifically increased Angel's vulnerability to this known risk, occurred before Angel died, and caused increased vulnerability to danger and death.

    B. <u>Entity Defendants Are Not Immune Under the Eleventh Amendment</u>.

While the Eleventh Amendment immunizes states and "arms of the state", such immunity does not apply to political subdivisions (like counties). *Robertson v. Morgan County, Bd. of County Com'rs*, 166 F.3d 1222 (10th Cir. 1999). As such, Defendant BOCC is not immune.[12]

Defendant JHS is also not entitled to immunity. While a number of cases have found county-level departments of social services to be immune, the District Court's in the *T.D.* case lays out circumstances under which the opposite conclusion should be reached.  Thus, in holding Denver Human Services immune there, Judge Moore noted "three issues, that, if properly raised, argued, and supported, may result in a different outcome in a future case":

> First is the U.S. Supreme Court's instruction in *Doe*, and reiterated by the Tenth Circuit in *Duke*, that the Eleventh Amendment's key concern is with who is legally obligated to pay the judgment being sought. *Doe*, 519 U.S. at 428, 117 S.Ct. 900; *Duke*, 127 F.3d at 981. Here, there is no evidence regarding whether the State of Colorado would be legally liable for any judgment rendered against the DJHS in this case. Thus, on this occasion, the Court has not been able to determine the same.

> Second is the Tenth Circuit's explanation that a *fundamental* characteristic of a political subdivision is "political control by some community other than the state as a whole." *Sturdevant*, 218 F.3d at 1170. Here, although the parties appear to agree that the county board is effectively the Mayor for the City and County of Denver, they fail to discuss the applicability of this fundamental characteristic of a political subdivision or the weight that should be assigned to it.

> Third is the Colorado Supreme Court's holding in *Davidson* that the judicial districts of Colorado are political subdivisions because each district represents a "finite geographical area" for the purpose of providing judicial services to that district's residents, and the district attorney for each district is "elected solely by the voters of

---

[12] Defendants do not assert that they have Eleventh Amendment Immunity with respect to the Rehabilitation Act claim, which is they only seek to dismiss based on their general statute of limitations arguments.

their judicial district." *See Davidson*, 83 P.3d at 656. Although the situation appears similar here in the context of the services the DJHS provides, again, neither party has briefed whether *Davidson*, or at least its reasoning, is applicable here.

*T.D. v. Patton*, 149 F.Supp.3d at 1308, fn7 (internal citations omitted).

Defendant JHS operates in practice much more like a county-level political subdivision than an arm of the state. First, it is subject to "political control by some community other than the state as a whole," and thus exhibits a *fundamental* characteristic of a political subdivision." *T.D.*, 149 F.Supp.3d at 1308 n.7 (italics in original). As pled, JHS answers to the County Manager and then to the Board of County Commissioners—a political body elected solely by the voters of Jefferson County, Colorado. SAC ¶¶257-261. Moreover, it provides child protective services only within a finite geographic area, Jefferson County. SAC ¶¶255-56. As such, it is analogous to the judicial districts, found by the Colorado Supreme Court to be political subdivisions. *Id.*

Unsurprisingly, given its county-level political control and county-defined provision of services, JHS has substantial operational and financial autonomy with respect to its provision of child protective services. JHS hires and fires its employees, it pays the salaries of Defendant Connell and other employees, and it controls the details of their performances. SAC ¶¶248-252, 254. It also develops its own child-protective programs and policies, including the RED team system and a new (and county-specific) phone application. SAC ¶¶254-56.

JHS also has substantial financial autonomy: out of local tax revenues it budgets over $20 million to pay for Jefferson County's Child, Family, and Adult Protective Services program. SAC ¶253. Further, JHS is defended at the County Attorney level and would likely pay any damage awards out of the county-created and county-administered fund when its program fails to

protect children as spectacularly as it did here.[13]  SAC ¶¶262-63.

## V.   PLAINTIFFS' CLAIMS ARE NOT TIME BARRED

Defendants seek to have the SAC dismissed as "barred by the relevant two-year statute of limitations…" MTD, p. 1. Yet Plaintiffs' May 5, 2017 Complaint (indisputably within the statute of limitations) listed both Connell and Jefferson County as Defendants. At the September 7, 2017 status conference, the Court allowed amendment to dismiss parties, clarify or amend the legal theories, and to more accurately plead the causes of action.

The SAC asserts claims against the County Defendants under §1983 and the Rehabilitation Act, and claims against Monica Connell under §1983 and wrongful death. While the SAC clarifies the factual bases and parties to each claim, all of these claims were asserted and these parties named in the original complaint. Defendants do not contend that these *parties* weren't identified and timely sued – rather they argue the additional facts and claims in the SAC do not "relate back to the original complaint." MTD, p. 4.[14]

But all of the additional allegations and amendments clearly relate back to the original

---

[13] The "vulnerability of the State's purse is the most salient factor in Eleventh Amendment determinations." *Duke v. Grady Mun. Schools*, 127 F.3d 972, 974 (10th Cir. 1997) (citation, internal quotation marks, and alteration omitted). The *T.D.* court and associated parties made some attempt to reach a determination on vulnerability of the Colorado's purse in an analogous context. Testimony by DDHS officials "strongly suggest[ed]" to Judge Moore that the county was legally liable for money judgments against it due to catastrophic failures of its child protective services. 149 F.Supp.3d at 1300-01 (citations omitted).

[14] In conferral regarding amending the complaint, counsel for Plaintiffs agreed that they would substitute the Board of County Commissioners for Jefferson County as the named County Defendant. Undersigned counsel made this agreement to streamline the substantive areas of litigation, despite believing that Jefferson County was also a properly named defendant in this §1983 action. *See e.g. Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213 (10th Cir. 2002). In further conferral after their motion to dismiss, Defendants have authorized undersigned counsel to represent they are not arguing that either of these parties did not have notice that this action was filed against them. Thus, to the extent the original complaint was sufficient to relate back to Jefferson County, it is also sufficient against the stipulated substituted BOCC.

filing. It is well established that bringing pleadings up to date with regard to an already stated claim is appropriate. *See* Wright, Miller & Kane, Fed. Prac. & Proc. Civ.2d § 1474 where the authors cite numerous federal cases in footnote 9 holding that "a party may make an amendment to amplify a previously alleged claim or defense."

Further, to the extent that any of these claims are construed as new, under Rule 15(c)(1)(B), an amendment relates back when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." The reasoning behind this rule "is that 'a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide.'" *Laratta v. Raemisch*, No. 12–cv–02079, 2014 WL 1237880, at *15 (D. Colo., March 26, 2014) *quoting Baldwin Cnty. Welcome Ctr. v. Brown,* 466 U.S. 147, 149 n.3 (1984). Provided there is a "factual nexus" between the original and amended complaints, the amended claim "is liberally construed to relate back to the original complaint if the defendant had notice of the claim and will not be prejudiced by the amendment." *Id.* The relation back doctrine has been aptly summarized as follows:

> **As a general rule, amendments will relate back if they amplify the facts previously alleged, correct a technical defect in the prior complaint, assert a new legal theory of relief, or add another claim arising out of the same facts.** For relation back to apply, there is no additional requirement that the claim be based on an identical theory of recovery. On the other hand, amendments generally will not relate back if they interject entirely different facts, conduct, transactions or occurrences.

*Benton v. Bd. of Cnty. Comm'rs, Adams Cnty.*, No. 06-cv-01406-PSF-MEH, 2007 WL 4105175, at *3 (D. Colo. Nov. 14, 2007) (Emphasis supplied).

All parties had notice that Plaintiffs were asserting claims arising out of this exact fact pattern. With respect to Defendant Connell, she was sued under §1983 for her conscience

shocking conduct causing death. It was specifically also alleged that her "**willful and wanton conduct caused the death of Angel Goodwin.**" Doc. 1, ¶49 (Emphasis supplied).[15] Adding her to the original wrongful death claim does not allege anything new and regardless, unequivocally relates back as it merely "amplifies the conduct and occurrences referred to in the original complaint." *Hughes v. Colorado Dept. of Corrections*, 594 F.Supp.2d 1226, 1235–36 (D. Colo. 2009) (As the original complaint gave notice of claims regarding medical care, "the surprise that Rule 15(c)(1)(B) guards against appears to be nonexistent.").

Similarly, the original Complaint contains allegations regarding County Defendants' actions in allowing numerous reports of serious abuse to be intentionally ignored and seeks damages against it. See Complaint, ¶¶ 6, 7, 17, 18, and 24, pp. 19-20. Although County Defendants argue that the initial complaint didn't clearly assert claims against them, they also moved to dismiss that Complaint, making largely the same arguments they make regarding the SAC.[16] Providing *additional* details and pointing to *more specific* regulatory deviations in response to these arguments do not constitute "new facts" but are simply more specific facts.[17]

Given the liberal rules of pleading and because dismissal of a case is such a harsh remedy, courts consistently allow plaintiffs to amend and clarify theories of liability to promote

---

[15] Moreover, in 2015, Ms. Connell was actually given notice of this precise claim in the attached CGIA Notice of Claims regarding her willful and wanton conduct resulting in wrongful death. **Exhibit B**. As Plaintiffs also stated in their notice of claims with respect to Jefferson County: "The extensive history of repeated contacts and investigations conducted into Najera in which no action was taken plainly indicate a massive failure within Human Services as it pertains to the placement of Angel with Najera." **Exhibit B.**

[16] Thus, they argued in Doc. 34 that even if Plaintiffs named BOCC instead of Jefferson County, that BOCC asserted 11th amendment immunity, that there was no underlying constitutional violation and no evidence of a policy – all defenses they still maintain.

[17] For example, it was previously alleged that Defendants ignored the requirements incumbent upon them by Colorado Regulations.  Complaint, ¶17. A *more specific* statement of the how the specific regulations which were violated clearly relates back.

justice. *Martinez v. Xclusive Management*, LLC, No. 15–cv–00047, 2015 WL 12734809, at *8

(D. Colo., August 12, 2015) citing *Cayman Exploration Corp. v. United Gas Pipe Line*, 873 F.2d

1357, 1359 (10th Cir. 1989) (allowing amendment and noting that "the Court typically does not

dismiss a claim under Rule 12(b)(6) until the plaintiff has been provided notice and an

opportunity to amend the complaint to cure the defective allegations.").

## VI.   DEFENDANT CONNELL SHOULD NOT BE DISMISSED FOR LACK OF TIMELY SERVICE

F.R.C.P. Rule 4(m) requires service of process to be made within 90 days of filing, here

August 3, 2017. Upon showing good cause for the failure to timely serve, the time must be

extended. Even absent good cause, the district court "must still consider whether permissive

extension of time may be warranted." *Espinoza v. United States,* 52 F.3d 838, 841 (10th Cir.

1995). Such extension is particularly important "if the applicable statute of limitations would bar

the refiled action." F.R.C.P. 4(m).[18]

As shown in the attached Affidavit of Plaintiff's Counsel, John Halepaska, there was

good cause for this three-week delay in service. **Ex. A.** Plaintiffs filed suit on May 5, 2017.  At

that time, Mr. Halepaska worked at the Jordan Law Firm. He left that firm in June of 2017 and

withdrew as counsel. Mr. Halepaska learned that the Jordan Law Firm was not continuing to

represent plaintiffs, and he promptly entered his appearance on July 14, 2017.

The Jordan Law Firm had not yet served the original complaint. Mr. Halepaska

---

[18] Both the 1993 Amendment Advisory Committee Notes and case law make clear that relief as a
matter of discretion is frequently justified if the applicable statute of limitations would bar re-
filing, *See* F.R.C.P 4, advisory committee note of 1993; *Millan v. USAA General Indem. Co*., 546
F.3d 321, 325-326 (5th Cir. 2008) (when applicable statute of limitations likely bars future
litigation, dismissal under F.R.C.P. 4(m) is reviewed under same heightened standard used to
review dismissal with prejudice); *Mann v. American Airlines,* 324 F.3d 1088, 1090-1091 (9th
Cir. 2003) (court properly extended time to serve when statute of limitations would bar re-filing.)

determined to amend the original complaint and then serve the operative complaint. The First Amended Complaint was filed July 18, 2017 and subsequently accepted for filing on July 31, 2017. The next day, Mr. Halepaska served all Defendants. From his work at the Jordan Law Firm, he believed that Ms. Connell still worked at the County and that he could serve her there.

Service was timely effectuated on all Defendants except for Ms. Connell on August 1, 2017. Upon service of the County, the process server was informed that Ms. Connell no longer worked there and that no information about her whereabouts would be provided. **Ex A.** Plaintiffs immediately hired a private investigator to locate her and she was served August 24, 2017, just three weeks past the 90 day period and without Order to Show Cause. See **Ex. A**. Diligent efforts were made to comply and "good cause" justifies an extension. *Commodities Future Trading Com'n v. Wall Street Underground, Inc.,* 221 F.R.D. 554, 557–58 (D. Kan., 2004) (extending time for service where "Plaintiff's affidavit demonstrates that it has made a good faith effort to locate" defendant.").[19]

Even absent "good cause," the Court must consider granting a permissive extension, by evaluating whether defendant was on notice or prejudiced by delay of service, and whether the applicable statute of limitations would bar re-filing of the action. *Blackmon v. U.S.D. 259 Sch. Dist.*, 769 F. Supp.2d 1267, 1275 (D. Kan. 2011). Here, permissive extension is clearly warranted. Defendant Connell suffered no prejudice from the three additional weeks before service.  The District Attorney's Office, who represents Ms. Connell, was then actively involved,

---

[19] *See Geller v. Newell,* 602 F. Supp. 501, 502 (S.D.N.Y. 1984) (service made two weeks after deadline did not warrant dismissal when plaintiff established good cause through reasonable efforts to serve process, brief delay, and absence of prejudice). *Gerena v. Korb,* 617 F.3d 197, 203-204 (2d Cir. 2010); *Nelle v. Ciotti,* 151 F.R.D. 568, 570 (E.D. Pa. 1993) (good cause demonstrated where plaintiff made two attempts at service and defendant moved out of state without forwarding address); *Quann v. Whitegate-Edgewater*, 112 F.R.D. 649 (D. Md. 1986).

moving to dismiss on the basis that she did not violate the constitution and aware that service was being attempted. Further, Ms. Connell was on notice of these willful and wanton claims since 2015. **Ex. B**.

Plaintiffs, however, would suffer great prejudice upon dismissal as the statute of limitations would bar re-filing. Where the limitations has run, dismissal is "overly harsh," because it operates as a dismissal with prejudice, "a result that rule 4(m) typically does not contemplate." *Blackmon v. U.S.D. 259 Sch. Dist.*, 769 F.Supp.2d 1267, 1275 (D. Kan. 2011); *Mata v. Anderson*, 760 F.Supp.2d 1068, 1097-1101 (D.N.M. 2009) (granting permissive extension where counsel missed the deadline by 40 days, rectified the problem on their own initiative, [as here] and was thus "more diligent tha[n] the plaintiffs in other cases who have effected service only after the Court issues them a notice that dismissal is imminent").

WHEREFORE, Plaintiffs request that the Court deny the Motion in its entirety.

Respectfully submitted this 10th day of January, 2018.

<div style="display:flex">

*/s/ Anna Holland Edwards*
Anna Holland Edwards
John R. Holland
Erica T. Grossman
Dan Weiss
HOLLAND, HOLLAND EDWARDS & GROSSMAN, P.C.
1437 High Street
Denver, CO 80218
303-860-1331
303-832-6506 - fax
anna@hheglaw.com
*Attorneys for Plaintiffs*

*/s/ John D. Halepaska*
John D. Halepaska
LAW OFFICES OF JOHN D. HALEPASKA
113 Ardmore Street
Castle Rock, CO 80104
720-499-9291
303-496-0194 - fax
john@halepaskalaw.com
*Attorney for Plaintiffs*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2018 I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to the following:

Eric Butler
Rachel Bender
100 Jefferson County Parkway, Suite 5500
Golden, CO  80419
303-271-8932
303-271-8901 – fax
ebutler@jeffco.us
rbender@jeffco.us
*Attorneys for Defendants*

*/s/ Brooke Thiele-LaForest*
Brooke Thiele-LaForest, Paralegal