IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 17-cv-01124-PAB-SKC

THE ESTATE OF ANGEL GOODWIN, by and through Shawn Alvarado, personal
representative, and
SHAWN ALVARADO, individually,

      Plaintiffs,

v.

MONICA CONNELL,
BOARD OF COUNTY COMMISSIONERS FOR JEFFERSON COUNTY COLORADO,
and
JEFFERSON COUNTY HUMAN SERVICES,

      Defendants.
_____

**ORDER**
_____

     This matter is before the Court on the County Defendants' Motion to Dismiss

Second Amended Complaint and Jury Demand [Docket No. 70] filed by defendants

Monica Connell, Jefferson County Human Services ("JHS"), and the Board of County

Commissioners for Jefferson County, Colorado ("BCC"). The Court has jurisdiction

pursuant to 28 U.S.C. §§ 1331 and 1367.

**I. BACKGROUND**[1]

     This case arises out of the drowning death of a ten-year-old boy, Angel Goodwin,

on May 6, 2015. Docket No. 103 at 2, ¶ 1. Angel was born prematurely on January 12,

2005. *Id.* at 6, ¶¶ 25-26. From the date of his birth, Angel was "completely disabled

---

[1]The facts stated below are taken from plaintiffs' substituted second amended
complaint ("second amended complaint"), Docket No. 103, and are presumed to be true
for purposes of the motion to dismiss.

physically and developmentally" and "was totally reliant on others for round the clock care." *Id.* at 6, ¶¶ 26-27.  In August 2005, Jefferson County placed Angel in the custody of his grandmother, Onesia Najera.  *Id.* at 2, ¶ 2.  Beginning in 2006, county-level human services agencies in Denver, Adams, and Jefferson Counties received reports that Ms. Najera was abusing Angel and his siblings, who were also in Ms. Najera's care. *Id.* at 7, ¶ 31.  After Ms. Najera's return to Jefferson County in 2014, *id.*, ¶ 35, Jefferson County Human Services was made aware of numerous complaints alleging that Ms. Najera was leaving the children at home alone, leaving Angel in the care of his young siblings and/or locked in a dark closet, failing to provide the children with adequate food, and engaging in drug use and prostitution.  *Id.* at 9, ¶ 54.  The complaints came from a variety of sources, including Ms. Najera's neighbor, Angel's school teacher, Ms. Najera's brother, and Ms. Najera herself, who informed Wheat Ridge police that there was violence in the home.  *See id.* at 10-12, 15-16, 28,  ¶¶ 58, 65, 67-68, 70, 91, 159. Many of these complaints were classified under Colorado Department of Human Services regulations as High Risk Assessments ("HRAs").  *Id.* at 2, 8, 11, ¶¶ 5, 42, 69. HRAs must be completed with a finding within sixty days.  *Id.* at 8, ¶ 48.  Defendant Monica Connell, a caseworker with Jefferson County Human Services, became the lead investigator on these complaints in January 2015.  *Id.* at 11, ¶ 69.  Ms. Connell had access to all previous complaints against Ms. Najera through the statewide system for tracking reports of child abuse (the "Trails" system).  *Id.* at 7, 12, ¶¶ 37-38, 71.

As early as February 2015, Ms. Connell determined that a "Dependency and Neglect proceeding was required to protect Angel and the other children in Ms. Najera's

care." *Id.* at 3, ¶ 6. However, she engaged in "procedural manipulations to avoid carrying out that decision." *Id.* Specifically, Ms. Connell would "close one investigation after another as 'inconclusive,'" and move "[complaints] over into [other], not yet expired, investigation[s]" in order to extend statutory deadlines. *Id.* at 13-14, 51, ¶¶ 83, 293. Final decision-makers for Jefferson County expressly approved of these procedural tactics. *Id.* at 33, ¶ 188. Ms. Connell also made "multiple recommendations that a case not be opened" and that Angel "remain in the custody of Onesia Najera." *Id.* at 52, ¶ 295. Throughout this process, Ms. Najera repeatedly failed to comply with mandatory drug testing and other requests made to her by Ms. Connell. *See id.* at 19, 21, 24, ¶¶ 108, 116-17, 134.

On May 6, 2015, Angel drowned when Ms. Najera left him unattended in a bath. *Id.* at 32, ¶¶ 179. Ms. Najera was high on drugs at the time. *Id.* at 32, ¶¶ 179, 184. Plaintiffs – Angel's estate ("Estate") and Angel's father, Shawn Alvarado – filed this lawsuit on May 5, 2017. Docket No. 1. The operative complaint, filed on January 9, 2018, asserts claims under 42 U.S.C. § 1983 against Ms. Connell, the Board of County Commissioners for Jefferson County, and Jefferson County Human Services for the violation of Angel's substantive due process rights under the Fourteenth Amendment. *See* Docket No. 103 at 49-56. The complaint also asserts a claim under section 504 of the Rehabilitation Act against BCC and JHS, and a claim for wrongful death against Ms. Connell. *See id.* at 56-58.[2]

---

[2]While the complaint also asserts claims against Personal Assistance Services of Colorado, Inc. d/b/a PASCO, all claims against PASCO were dismissed with prejudice before the filing of the substituted second amended complaint. *See* Docket Nos. 95, 99. It therefore appears that the claims against PASCO were included in the

Defendants Connell, BCC, and JHS (the "county defendants") moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(1), 12(b)(5), and 12(b)(6). Docket No. 70.[3] Plaintiffs filed a response to the motion on January 10, 2018, Docket No. 104, to which defendants replied on January 24, 2018. Docket No. 107.[4]

## II. LEGAL STANDARD

Defendants move to dismiss pursuant to Rules 12(b)(1), 12(b)(5), and 12(b)(6) of the Federal Rules of Civil Procedure. Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is appropriate if the Court lacks subject matter jurisdiction over claims for relief asserted in the complaint. Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)). When reviewing the factual basis on which subject matter jurisdiction rests, the district court does not presume the truthfulness of

---

substituted second amended complaint in error.

[3]Although the operative complaint was filed after defendants' motion to dismiss, *see* Docket No. 103, the parties agreed that the amended allegations did not affect the pending motion. *See* Docket No. 97 at 2, ¶ 5.

[4]Each of the claims in this case is asserted against only certain defendants. In addition, the wrongful death claim is asserted only by plaintiff Alvarado and the § 1983 and Rehabilitation Act claims are asserted only by plaintiff Estate. Nonetheless, for purposes of ease and consistency, the Court will use the terms "plaintiffs" and "defendants" in resolving the motion to dismiss as to each claim.

the complaint and "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (citations omitted). Consideration of evidence outside the pleadings does not convert the motion to a Rule 56 motion. *Id.*

Federal Rule of Civil Procedure 12(b)(5) allows for dismissal of an action without prejudice based on insufficient service of process. Under Fed. R. Civ. P. 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time" unless the plaintiff shows good cause for the delay. A court applying these rules engages in a two-part inquiry. *See Moore v. Teamsters Local 41*, 2015 WL 859074, at *2 (D. Kan. Feb. 27, 2015). First, the court determines whether the plaintiff has shown good cause for his failure to timely serve the defendant. *Id.* If good cause is shown, then an extension of the time for service of process is mandatory. *See* Fed. R. Civ. P. 4(m); *see also Thunder Mountain Custom Cycles, Inc. v. Thiessen*, No. 06-cv-02527-EWN-BNB, 2008 WL 618898, at *6 (D. Colo. Mar. 5, 2008). If good cause is not shown, then the court proceeds to the second step of the analysis and determines whether a permissive extension is warranted. *See Moore*, 2015 WL 859074, at *2.

In contrast to motions to dismiss brought under Fed. R. Civ. P. 12(b)(1) and 12(b)(5), a motion under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the complaint. To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of

Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted ).

## III. ANALYSIS

### A. Eleventh Amendment Immunity

Defendants argue that plaintiffs' § 1983 claims against BCC and JHS are barred by Eleventh Amendment immunity. Docket No. 70 at 12.[5]

---

[5]Defendants do not seek dismissal of plaintiffs' Rehabilitation Act claims on immunity grounds. *See* Docket No. 70 at 11-12; Docket No. 104 at 13 n.12; *see also Arbogast v. Kan., Dep't of Labor*, 789 F.3d 1174, 1183 (10th Cir. 2015) (noting that "receipt of funds under the Rehabilitation Act is a valid waiver of [Eleventh Amendment]

"Only a state or 'arms' of a state may assert the Eleventh Amendment as a defense to suit in federal court." *Sutton v. Utah State School for the Deaf & Blind*, 173 F.3d 1226, 1232 (10th Cir. 1999). In determining whether a political subdivision constitutes an "arm of the state," courts consider five factors: (1) the characterization of the governmental unit under state law; (2) the guidance and control exercised by the state over the governmental unit; (3) the funding that the governmental unit receives from the state; (4) the governmental unit's ability to issue bonds and levy taxes on its own behalf; and (5) the state's legal liability to pay a judgment against the governmental unit. *Colby v. Herrick*, 849 F.3d 1273, 1276 (10th Cir. 2017).[6] The final factor, which the Tenth Circuit has characterized as the most significant, *see Duke*, 127 F.3d at 974 (noting that the "most salient factor" is the "vulnerability of the State's purse"), focuses on a state's "legal liability for a judgment, rather than [on the] practical, or indirect, impact a judgment would have on a state's treasury." *Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000). Applying the factors identified above (the "*Mount Healthy* factors"),[7] defendants argue that both JHS and BCC constitute "arms of the state" for

_____

immunity" (emphasis omitted)).

[6]The Tenth Circuit has alternatively framed the four factors as a two-part inquiry: "The court first examines the degree of autonomy given to the agency, as determined by the characterization of the agency by state law and the extent of guidance and control exercised by the state. Second, the court examines the extent of financing the agency receives independent of the state treasury and its ability to provide for its own financing." *Duke v. Grady Mun. Schs.*, 127 F.3d 972, 974 (10th Cir. 1997) (internal quotation marks and brackets omitted).

[7]The Supreme Court set forth the factors relevant to the Eleventh Amendment immunity analysis in *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). The original test appears to have included only the first four factors identified above. *See Mount Healthy City Sch. Dist. Bd. of* Educ., 429 U.S. at

Eleventh Amendment immunity purposes.

### 1. JHS

Courts in this District have consistently applied the *Mount Healthy* factors to hold that county departments of human services constitute "arms of the state" for purposes of Eleventh Amendment immunity. *See Schwartz v. Jefferson Cty. Dep't of Human Servs.*, No. 09-cv-00915-WJM-KMT, 2011 WL 1843309, at *2 (D. Colo. May 16, 2011) (collecting cases); *see also T.D. v. Patton*, 149 F. Supp. 3d 1297, 1308-09 (D. Colo. 2016) (holding that the Denver Department of Human Services constitutes an "arm of the state" for purposes of Eleventh Amendment immunity); *Starkey v. Boulder Cty. Soc. Servs.*, No. 06-cv-00659-LTB-PAC, 2006 WL 8073690, at *4-5 (D. Colo. Nov. 21, 2006) (holding that Boulder County Social Services constitutes an "arm of the state"); *Pierce v. Delta Cty. Dep't of Soc. Servs.*, 119 F. Supp. 2d 1139, 1148 (D. Colo. 2000) (finding, based on reasoning in *Wigger v. McKee*, 809 P.2d 999 (Colo. App. 1990), that Delta Social Services was an "arm of the state" for Eleventh Amendment immunity purposes). In addition, courts have noted the "long line of state precedent" reaching the same conclusion. *See Schwartz*, 2011 WL 1843309, at *2 (citing cases demonstrating "that county departments of human services are mere agencies and divisions of the State Department of Human Services"); *see also Wigger*, 809 P.2d at 1004-05 (holding that the Arapahoe County Department of Social Services is an "arm of the state" for purposes of the Eleventh Amendment).

---

280-81; *Sutton*, 173 F.3d at 1232 (identifying four factors relevant to immunity analysis). The Tenth Circuit has since added the fifth factor. *See Sturdevant*, 218 F.3d at 1164 (identifying "state treasury liability" as a separate factor). For simplicity, this order will refer to all five factors as the "*Mount Healthy* factors."

In *Schwartz*, the district court found that the factors supported a finding that the Jefferson County and Denver County Departments of Human Services constituted "arms of the state" for purposes of Eleventh Amendment immunity.  *See* 2011 WL 1843309, at *3-5.  With respect to the first factor, the court found that Colorado law characterizes county departments of human services as agents of the state.  *See id.* at *3 (citing Colo. Rev. Stat. § 26-1-118(1) (2010) and 11 Colo. Code Regs. § 2508-1, 5.231); *see also* Colo. Rev. Stat. § 26-1-118(1) ("The county departments or other state designated agencies . . . shall serve as agents of the state department.").  The court found that the second factor also supported such a finding because the county departments are "charged with the administration of public assistance and welfare . . . in accordance with the rules and regulations of the state department."  *Schwartz*, 2011 WL 1843309, at *3 (citing Colo. Rev. Stat. § 26-1-118(1)).  In reaching this conclusion, the court rejected the plaintiffs' argument that the county human services agencies were not agents of the state because they exercise significant autonomy in personnel and budgetary decisions.  *See id.*  The court acknowledged the existence of some degree of local control, but found that "a careful review" of the statutory provisions demonstrated that the ultimate decision-making and regulatory authority rested with the state.  *Id.* at *4; *see also Sturdevant*, 218 F.3d at 1168 (finding that, "although the Board enjoy[ed] a significant degree of autonomy," the "state control" factor weighed in favor of immunity because the Board's decisions were subject to state approval and "[t]he Board [was] itself the state's instrumentality of control over local and regional educational institutions").  As to the third *Mount Healthy* factor, the court gave

substantial weight to the fact that "Colorado law requires the state to provide eighty percent of the county services departments' total budgets." *Schwartz*, 2011 WL 1843309, at *5; *see also Freeman v. White*, No. 05-cv-00164-EWN-CBS, 2006 WL 2793139, at *10 (D. Colo. Sept. 28, 2006) (noting that "the state fisc is the predominant source of funding for" the Denver Department of Human Services and that "eighty percent of the overall cost of the programs administered by the county departments comes from the state department of human services"). Finally, the court concluded that there was no dispute that county human services agencies lack the power to issue bonds and levy taxes and thus the fourth *Mount Healthy* factor weighed in favor of a finding that the defendants were arms of the state for immunity purposes. *Id.*

The Court finds the analysis in *Schwartz* persuasive and adopts it here. While plaintiffs make several arguments for why JHS does not constitute an "arm of the state," none of those arguments address the court's analysis in *Schwartz* or mandate a different outcome. Plaintiffs first contend that JHS is not an arm of the state because it is subject to county-level political control, serves a finite geographic area, and has "substantial operational and financial autonomy" with respect to personnel decisions, the administration of child-protective programs and policies, and the management of its own budget. *See* Docket No. 104 at 14. These arguments pertain to the second *Mount Healthy* factor – the degree of state control. In *Schwartz*, however, the court rejected similar arguments, finding that the level of autonomy enjoyed by county human services departments does not outweigh the fact that the state retains ultimate decision-making authority over most issues. *See* 2011 WL 1843309, at *3-4; *see also* Colo. Rev. Stat.

§ 26-1-107(10) (providing that the "state board shall fix minimum standards and qualifications for county department personnel . . . and establish salary schedules based upon prevailing wages for comparable work"); Colo. Rev. Stat. § 26-1-123(3)(a) (providing that the "county board shall administer the [county social services fund] pursuant to rules adopted by the state department"); Colo. Rev. Stat. § 26-1-124(2) (providing that, before a county social services "budget is adopted by the board of county commissioners, it shall be submitted by the county board to the state department for review"). The Court agrees with the reasoning in *Schwartz* and finds that the state control factor weighs in favor of Eleventh Amendment immunity.

Plaintiffs also argue that JHS "is defended at the County Attorney level and would likely pay any damage awards out of the county-created and county-administered fund." Docket No. 104 at 14. While *Schwartz* did not explicitly address the issue of the state's legal liability, multiple courts considering whether county human services departments in Colorado are entitled to Eleventh Amendment immunity have found this factor to be inconclusive. *See, e.g.*, *T.D.*, 149 F. Supp. 3d at 1300 (noting that "the statutory law governing human services in Colorado provides no guidance on" whether the state would be legally liable for a judgment entered against a county human services department); *Freeman*, 2006 WL 2793139, at *10 (noting that "the state law issue as to the ultimate liability for any judgment against [Denver Department of Human Services] remains uncertain"); *Wigger*, 809 P.2d at 1004 ("Because no provision has been made for the county departments to have their own funds to satisfy judgments against them, it appears that they would look to the statutory treasury for such."). Plaintiffs here allege that the "State of Colorado does not, and is not required to

indemnify . . . Jeffco Human Services for . . . monetary judgments." Docket No. 103 at 48, ¶ 263. However, indemnification is separate from the issue of direct liability, with only the latter weighing in favor of a finding that a governmental unit is entitled to immunity. *See Pierce*, 119 F. Supp. 2d at 1147 (stating that the "key question" addressed by the third and fourth *Mount Healthy* factors is "whether funds to satisfy a money judgment come directly from the state or indirectly through commingled state and local funds or state indemnification provisions"). The parties do not otherwise cite any authority conclusively resolving the state's legal liability for money judgments entered against JHS. Nevertheless, the Court need not decide the issue. Because the remaining *Mount Healthy* factors weigh in favor of a finding that county human services departments are arms of the state, the Court agrees that JHS is entitled to Eleventh Amendment immunity with respect to plaintiffs' § 1983 claims. *See Sturdevant*, 218 F.3d at 1166 (declining to resolve issue of state's legal liability where remaining factors weighed in favor of finding that the defendant was entitled to immunity).[8]

_____

[8]In arguing that JHS is not an arm of the state for Eleventh Amendment immunity purposes, plaintiffs rely on a recent decision from another court in this District in which the court identified "three issues that, if properly raised, argued, and supported" could result in a finding that a county human services department is an arm of the state. *T.D.*, 149 F. Supp. 3d at 1308 n.7. Those issues are: (1) the state's legal liability for a judgment entered against the county department; (2) the weight and applicability of local-level political control; and (3) the relevance of the Colorado Supreme Court's holding in *Davidson v. Sandstrom*, 83 P.3d 648 (Colo. 2004), that judicial districts are political subdivisions of the state because they represent "a finite geographical area." *T.D.*, 149 F. Supp. 3d at 1308 n.7. However, *T.D.* does not ultimately support plaintiffs' position. Notwithstanding its discussion of the above issues, the court in *T.D.* found that the Denver Department of Human Services was entitled to Eleventh Amendment immunity. Plaintiffs have not cited any cases relying on *T.D.* to hold that a county human services department is not an arm of the state.

## 2. BCC

Defendants argue that the same rationale for finding that JHS is an arm of the state applies to BCC. Docket No. 70 at 13. Specifically, defendants contend that the county social services budget must be reviewed by the state prior to approval by BCC. *Id.* But this argument pertains to JHS's arm-of-the-state status, not BCC's. BCC is the governing body of Jefferson County and the proper defendant in any lawsuit against the county. *See* Colo. Rev. Stat. § 30-11-105 ("In all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be, 'The board of county commissioners of the county of . . . .'"). It is well established that counties are not entitled to Eleventh Amendment immunity. *See Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979) ("[T]he Court has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power.'"); *Mount Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 280 ("The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations." (internal citations omitted)). Defendants do not cite any authority to the contrary. Accordingly, the Court finds that BCC is not entitled to dismissal of plaintiffs' § 1983 claims on the basis of Eleventh Amendment immunity.[9]

---

[9]While defendants cite *Cuin v. Adams County Board of County Commissioners*, No. 10-cv-01704-PAB-MEH, 2011 WL 2683116 (D. Colo. July 11, 2011), for the proposition that boards of county commissioners are "arms of the state" for Eleventh Amendment immunity purposes, the Court did not need to address the issue in that case because it was undisputed by the parties. *See id.* at *3.

**B. Statute of Limitations**

Defendants move to dismiss all claims on the ground that they are barred by the applicable statute of limitations. Docket No. 70 at 1-2. The Tenth Circuit has "made clear that the statute of limitations for § 1983 actions brought in Colorado is two years from the time the cause of action accrued." *Fogle v. Pierson*, 435 F.3d 1252, 1258 (10th Cir. 2006). A two-year limitations period also applies to Rehabilitation Act and wrongful death claims. *See Ulibarri v. City & Cty. of Denver*, 742 F. Supp. 2d 1192, 1213 (D. Colo. 2010) (Rehabilitation Act claims); Colo. Rev. Stat. § 13-80-102(1)(d) (wrongful death claims).

Defendants do not dispute that plaintiffs' original complaint was filed within the two-year statute of limitations. *See* Docket No. 70 at 2 (stating that all causes of action were time-barred as of May 6, 2017); Docket No. 1 (complaint filed on May 5, 2017). However, they contend that the claims asserted in plaintiffs' second amended complaint do not relate back to the filing of the original complaint and were therefore time-barred as of May 6, 2017. *See* Docket No. 70 at 2-3.

Federal Rule of Civil Procedure 15(c)(1) governs the relation back of amended pleadings. Under that rule,

> [a]n amendment to a pleading relates back to the date of the original pleading when: (A) the law that provides the applicable statute of limitations allows relation back; (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading; or (C) the amendment changes the party or the naming of the party against whom a claim is asserted if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should

14

have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1). With regard to subsection (B), courts in this circuit have summarized the relation back rule as follows:

> As a general rule, amendments will relate back if they amplify the facts previously alleged, correct a technical defect in the prior complaint, assert a new legal theory of relief, or add another claim arising out of the same facts. For relation back to apply, there is no additional requirement that the claim be based on an identical theory of recovery. On the other hand, amendments generally will not relate back if they interject entirely different facts, conduct, transactions or occurrences. It is a matter committed to the district court's sound discretion to decide whether a new claim arises out of the same transaction or occurrence.

*Benton v. Bd. of Cty. Comm'rs*, No. 06-cv-01406-PSF-MEH, 2007 WL 4105175, at *3 (D. Colo. Nov. 14, 2007) (quoting *Kidwell v. Bd. of Cty. Comm'rs of Shawnee Cty.*, 40 F. Supp. 2d 1201, 1217 (D. Kan. 1998)).

Defendants contend that the claims asserted in the second amended complaint do not relate back to the filing of the original complaint under Rule 15(c)(1) because: (1) the second amended complaint includes new facts, Docket No. 70 at 3-4; and (2) plaintiffs assert new claims against BCC, JHS, and Ms. Connell. Docket No. 107 at 2. Plaintiffs respond that all of the claims asserted in the second amended complaint were included in the original complaint and that, even if any of the claims could be construed as new, they all arise out of the same factual context. Docket No. 104 at 15-16.[10]

---

[10]Plaintiffs state that "[d]efendants have authorized undersigned counsel to represent they are not arguing that [BCC and JHS] did not have notice that this action was filed against them." *Id.* at 15 n.14. In their reply brief, however, defendants clarify that BCC and JHS "do not contest that they had notice of *this action* – not that the action was filed against them." Docket No. 107 at 2 n.2.

### 1. Allegations Against BCC and JHS

Defendants argue that, because the factual bases for plaintiffs' municipal liability and Rehabilitation Act claims were not asserted in the initial complaint, these claims do not relate back to the original filing date. *See* Docket No. 70 at 2-3.

Plaintiffs' second amended complaint asserts a municipal liability claim against BCC and JHS based on "the multiple supervisory approvals of Defendant Connell's procedural actions," which, plaintiffs allege, evince "customs, habits and practices which condoned the use of subsequent complaints to extend the time for investigation." Docket No. 103 at 54, ¶ 311.[11]  However, the original complaint did not assert a municipal liability claim against any of the government defendants.  Nor did it contain any allegations regarding supervisory approvals or the existence of a municipal policy, practice, or custom sufficient to confer liability on the municipal defendants directly. Because plaintiffs' municipal liability claim "interject[s] entirely different facts" and conduct, it does not satisfy the requirements for relation back under Rule 15(c)(1)(B). *See Benton*, 2007 WL 4105175, at *4 (finding that plaintiff's Fifth Amendment due process claim did not relate back to the filing of the original complaint because "plaintiff's original complaint [did] not describe any conduct, transactions or occurrences that would support a claim that plaintiff's termination violated her due process rights"). Plaintiffs do not dispute that the statute of limitations on their § 1983 claims expired on May 6, 2017.  *See generally* Docket No. 104 at 15-16.  Given that the municipal liability claim was not asserted until October 25, 2017, *see* Docket No. 63, the Court finds that

---

[11]Plaintiffs' municipal liability claim against JHS is barred by Eleventh Amendment immunity and thus will not be considered here.

it is time-barred under the two-year statute of limitations applicable to § 1983 claims.[12]

The Court reaches a different conclusion as to the Rehabilitation Act claim. In their original complaint, plaintiffs asserted a Rehabilitation Act claim against the State of Colorado, the state Department of Human Services, and the Department of Health Care Policy and Financing alleging that "the regulatory scheme employed by these Defendants failed in its essential purpose of providing for Angel's health, safety, and wellbeing." Docket No. 1 at 17. Specifically, plaintiffs asserted that the regulatory scheme "actually allowed and failed to safeguard for PASCO *hiring* a known drug addict, prostitute, drug trafficker[, and] violent offender" to care for Angel, thereby denying him "any semblance of equal access to competent medical assistance." *Id.* at 18, ¶ 58. Elsewhere in the complaint, plaintiffs alleged facts showing that the government defendants – including employees of Jefferson County – failed to respond to numerous reports of child abuse against Ms. Najera. *See, e.g.*, Docket No. 1 at 2-3, ¶¶ 6-7, 17-18. In their second amended complaint, plaintiffs assert that BCC and JHS violated Angel's rights under the Rehabilitation Act by "den[ying him] a valid and timely investigation, conclusion and related action in response to the serious complaints of child abuse received by Jefferson County." Docket No. 103 at 56, ¶ 326. The Court finds that plaintiffs' amended Rehabilitation Act claim arises out of the same conduct alleged in the original complaint, namely, the failure of various government entities to take appropriate action in response to complaints of child abuse against Ms. Najera.

---

[12]Because the Court finds plaintiffs' municipal liability claim to be time-barred, the Court need not determine whether plaintiffs have stated a claim for municipal liability under Fed. R. Civ. P. 12(b)(6). *See* Docket No. 70 at 14 (arguing that plaintiffs' § 1983 claim against BCC should be dismissed for failure to state a claim).

Because plaintiffs did not assert a Rehabilitation Act claim against BCC or JHS in the original complaint, the Court must next determine whether defendants received adequate notice of the claim under Rule 15(c)(1)(C). Rule 15(c)(1)(C) contains two requirements: first, that the new party have "received such notice of the action that it will not be prejudiced in defending on the merits"; and second, that the party "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." BCC and JHS do not contest that they had notice of the lawsuit. Docket No. 107 at 2 n.2. Accordingly, the only issue is whether plaintiffs have satisfied the second requirement under Rule 15(c)(1)(C)(ii).

The Court finds that Rule 15(c)(1)(C)(ii) is satisfied as to BCC. The original complaint named "The County of Jefferson Colorado" as a defendant. Docket No. 1. It is well established that Colorado law requires a claim against a county to be asserted against the Board of County Commissioners. *Grady v. Jefferson Cty., Colo.*, No. 07-cv-01191-WDM-CBS, 2008 WL 178923, at *2 (D. Colo. Jan. 17, 2008); *see also* Colo. Rev. Stat. § 30-11-105 ("In all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be, 'The board of county commissioners of the county of . . . .'"). Accordingly, BCC "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(ii); *see also Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 548 (2010) ("The question under Rule 15(c)(1)(C)(ii) is . . . whether Costa Crociere knew or should have known . . . that it would have been named as a defendant but for an error.").

Likewise, BCC knew or should have known that plaintiffs would have asserted their Rehabilitation Act claim against Jefferson County/BCC but for a pleading mistake in the original complaint. Two facts support this conclusion: first, none of the claims in the original complaint were asserted against either county defendant named in the complaint; second, the Rehabilitation Act claim was asserted against all the other government entities responsible for Angel's continued placement in Ms. Najera's home. These facts demonstrate one of three possibilities: (1) that plaintiffs mistakenly omitted the county defendants from the claim-specific allegations; (2) that plaintiffs viewed the county defendants as being inseparable from the state entities; or (3) that plaintiffs misunderstood the role of the county defendants in the events giving rise to their claims. Such mistakes do not "foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied." *Krupski*, 560 U.S. at 549. Accordingly, plaintiffs' Rehabilitation Act claim against BCC is not subject to dismissal on statute of limitations grounds.

The Court reaches the opposite conclusion with respect to JHS. There is no evidence that plaintiffs' failure to name JHS in the original complaint was the result of a mistake. To the contrary, plaintiffs' allegations indicate that they were aware of JHS's role in the events at issue yet consciously decided to name the State Department of Human Services as a defendant instead of the county departments. *See, e.g.*, Docket No. 1 at 3-4, 11, ¶¶ 6, 9, 24. Plaintiffs do not make any argument in their response that would undermine this conclusion. The Court therefore finds that plaintiffs have failed to meet the requirements of Rule 15(c)(1)(C)(ii). *See Krupski*, 560 U.S. at 552 ("When the original complaint and the plaintiff's conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully

19

informed decision as opposed to a mistake concerning the proper defendant's identity, the requirements of Rule 15(c)(1)(C)(ii) are not met."); *Kole v. Smith*, No. 14-cv-01435-WJM-KLM, 2015 WL 5026194, at *10 (D. Colo. Aug. 26, 2015) (finding that plaintiff "did not make a mistake concerning the identity of [the] defendant" where plaintiff's "inclusion of [the defendant] in the Second Amended Complaint show[ed] that he knew that [the defendant] participated in his alleged constitutional violations, but chose to not name him").

### 2. Ms. Connell

Defendants argue that plaintiffs' revised allegations that Ms. Connell piggy-backed investigations in order to avoid having to comply with legally mandated deadlines constitute "new and separate allegations that do not relate back to the original complaint." Docket No. 70 at 4. The Court disagrees. As defendants acknowledge in their motion, plaintiffs' original complaint asserted that Ms. Connell acted with deliberate indifference "to her statutory and regulatory obligations during th[e] investigation [of child abuse reports against Ms. Najera]; discounted reports from mandatory reporters; failed to acknowledge and recognize the unconscionably poor health condition and low body weight of Angel; and declined to either institute a Dependency and Neglect action or take Angel into protective custody." Docket No. 1 at 8, ¶ 17. These same general allegations continue to form the basis of plaintiffs' Fourteenth Amendment claim against Ms. Connell. *See* Docket No. 103 at 51-52, ¶¶ 292-98 (alleging that Ms. Connell violated Angel's Fourteenth Amendment rights by (1) failing to investigate his case "with sufficient acuity and diligence," (2) disregarding complaints of abuse, (3) recommending that a case not be opened and that Angel

remain in the custody of Ms. Najera, and (4) deciding not to inform the court that a Dependency and Neglect proceeding was required). Rather than interjecting entirely new facts, plaintiffs' allegation that Ms. Connell piggy-backed her investigations in order to avoid statutory and regulatory obligations amplifies the facts asserted in the original complaint. *See Benton*, 2007 WL 4105175, at *4 (finding that plaintiff's amended complaint related back to her original complaint where allegations asserted in the original complaint were "at least a partial basis for plaintiff's [amended] First Amendment claim" and thus sufficient to put defendants on notice of that claim).

The Court reaches the same conclusion as to plaintiffs' wrongful death claim. Defendants argue that plaintiffs did not assert a wrongful death claim against Ms. Connell until October 25, 2017. Docket No. 70 at 2. While that is true, the original complaint did assert a § 1983 claim against Ms. Connell as well as a wrongful death claim against PASCO and Ms. Najera. *See* Docket No. 1 at 14-18. Plaintiffs' § 1983 claim against Ms. Connell was based on allegations that she breached her duties to Angel by failing to take appropriate "corrective action" to protect him from harm. *See id.* at 15, ¶ 47. The complaint also alleged that Ms. Connell's actions constituted "willful and wanton conduct" that caused Angel's death. *Id.*, ¶ 49. Thus, although the wrongful death claim in the second amended complaint constitutes a new claim against Ms. Connell, it arises out of the same facts asserted in plaintiffs' original complaint. *See Benton*, 2007 WL 4105175, at *4 (finding that newly asserted First Amendment claim was based on the same general set of facts alleged in the original complaint).

Defendants contend that plaintiffs' allegations regarding "willful and wanton

conduct" do not provide any notice of the facts underlying plaintiffs' wrongful death claim and "are not entitled to an assumption of truth."  Docket No. 107 at 2.  As to the first point, the Court has already found other allegations in the original complaint sufficient to place Ms. Connell on notice of the factual basis for plaintiffs' wrongful death claim.  As to the second point, defendants appear to challenge the sufficiency of plaintiffs' allegations under Rule 12(b)(6).  However, the only issue before the Court is whether plaintiffs' wrongful death claim satisfies the requirements of Fed. R. Civ. P. 15(c)(1)(B).  The Court finds that it does.  Accordingly, defendants are not entitled to dismissal of plaintiffs' wrongful death claim against Ms. Connell on statute of limitations grounds.

### C.  Service of Process

Defendants argue that all claims against Ms. Connell should be dismissed pursuant to Fed. R. Civ. P. 12(b)(5) because plaintiffs failed to serve Ms. Connell until 111 days after the filing of the original complaint.  Docket No. 70 at 4.  Federal Rule of Civil Procedure 4(m) provides that

> If a defendant is not served within 90 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Plaintiffs do not dispute that they failed to serve Ms. Connell within the time frame required by Rule 4(m).  *See* Docket No. 104 at 18.  Instead, they argue that "there was good cause for [their] three-week delay in service" because plaintiffs' counsel (1) learned, sometime after June 2017, that his former law firm was not continuing to represent plaintiffs; (2) promptly entered an appearance in the case on July 14, 2017

and attempted to serve all defendants on August 1, 2017; (3) was informed for the first time on August 1, 2017 that Ms. Connell no longer worked for Jefferson County; and (4) promptly hired an investigator to locate and serve Ms. Connell on August 24, 2017. Docket No. 104 at 18-19. According to plaintiffs' counsel, this sequence of events demonstrates that "[d]iligent efforts were made to comply" with the deadline for service and that "'good cause' justifies an extension." *Id.* at 19.

The Court finds that plaintiffs have not shown good cause for an extension. It is well established in this Circuit that "inadvertence or negligence alone do not constitute 'good cause' for failure of timely service." *In re Kirkland*, 86 F.3d 172, 176 (10th Cir. 1996). Neither counsel's substitution for plaintiffs' original counsel nor plaintiffs' failure to anticipate the possibility that Ms. Connell would no longer be employed by Jefferson County constitutes good cause for an extension. *See, e.g.*, *Wischmeyer v. Wood*, No. 07-cv-01863-LTB, 2008 WL 2324128, at *2 (D. Colo. June 2, 2008) (finding that plaintiff had failed to show good cause for failure to serve where "(1) present counsel was substituted for original counsel, (2) Plaintiff's counsel . . . was busy over the 'holiday season,' and (3) it was difficult to serve Deputy Wood because Park County processors were reluctant to serve an acting deputy sheriff and because Wood's home address was unlisted and he was difficult to locate"). However, the Court's finding does not end the inquiry under Fed. R. Civ. P. 4(m). As stated above, the Court must also consider whether a permissive extension is warranted. *See Espinoza v. United States*, 52 F.3d 838, 841 (10th Cir. 1995).

In determining whether to grant a permissive extension, courts consider several factors, including the complex requirements of multiple service, the plaintiff's pro se

status, the statute of limitations, the danger of prejudice to the defendant, and the length of the delay. *See Espinoza*, 52 F.3d at 842; *Moore*, 2015 WL 859074, at *2. While the first two of these factors are inapplicable in this case, the Court finds that the remaining factors weigh in favor of a permissive extension. As discussed above, the statute of limitations expired on plaintiffs' § 1983 claims on May 6, 2017. Accordingly, dismissal of plaintiffs' claims against Ms. Connell would effectively be with prejudice because they would be unable to refile the claims in federal court. Additionally, Ms. Connell was served with the complaint only three weeks after the deadline for service, and defendants have not shown that they suffered any prejudice as a result of the delay.

Because the Court grants plaintiffs a permissive extension of time for service, Ms. Connell is not entitled to dismissal of plaintiffs' claims against her under Fed. R. Civ. P. 12(b)(5).

### D. Qualified Immunity

Ms. Connell argues that she is entitled to qualified immunity with respect to plaintiffs' substantive due process claims brought under 42 U.S.C. § 1983. Docket No. 70 at 5. When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted).

### *1. Constitutional Violation*

Plaintiffs allege that Ms. Connell violated Angel Goodwin's substantive due process rights under the Fourteenth Amendment by failing to investigate complaints of abuse and neglect against his grandmother and legal guardian, Onesia Najera, and by affirmatively recommending that Angel remain in her care. *See* Docket No. 103 at 49-53, ¶¶ 275-301. Plaintiffs assert the substantive due process claim under the state-created danger doctrine, which allows a state actor to be "held liable for the violent acts of a third party if the state actor 'created the danger' that caused the harm." *Ruiz v. McDonnell*, 299 F.3d 1173, 1182 (10th Cir. 2002). A prima facie case under this doctrine requires a plaintiff to show that:

> (1) the charged state actors created the danger or increased the plaintiff's vulnerability to the danger in some way; (2) the plaintiff was a member of a limited and specifically definable group; (3) the defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) the defendants acted recklessly in conscious disregard of that risk; and (6) the conduct, when viewed in total, shocks the conscience.

*Id.* at 1182-83. A plaintiff must also establish two "preconditions" to trigger application of the doctrine: "that the state actor engaged in affirmative conduct and that there was private violence." *Estate of B.I.C. v. Gillen*, 761 F. 3d 1099, 1105 (10th Cir. 2014).

Defendants argue that plaintiffs cannot demonstrate a constitutional violation under a state-created danger theory for three reasons: (1) plaintiffs have not demonstrated any affirmative "bad action" on the part of Ms. Connell, Docket No. 70 at 6-7; (2) there are no allegations or evidence that the risk of harm to Angel was obvious or that Ms. Connell was aware of the risk, *id.* at 7-8; and (3) the allegations do not

demonstrate that Ms. Connell engaged in "conscience-shocking" conduct. *Id.* at 8. The Court finds each of these arguments unpersuasive.

As to the first argument, the Court finds that the second amended complaint contains plausible allegations of affirmative misconduct. Specifically, plaintiffs allege that Ms. Connell "made multiple recommendations that . . . Angel remain in the custody of Onesia Najera," which "contributed to Onesia Najera retaining custody of [him]." Docket No. 103 at 52, ¶¶ 295, 299; *see also id.* at 52, ¶ 298. The Tenth Circuit has held that a social worker's recommendation that a child remain in the custody of an abusive relative constitutes "affirmative" conduct sufficient to confer liability under a danger-creation theory. *See T.D.*, 868 F.3d at 1226. In *T.D.*, the Tenth Circuit interpreted its prior decision in *Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001), as establishing that conduct by state actors occurring after a child is placed in the legal custody of a relative "may be considered for a danger-creation claim provided it is 'affirmative.'" 868 F.3d at 1226. Relying on this rule, the court concluded that the defendant social worker's post-placement recommendations that T.D. "remain" in his father's temporary custody constituted affirmative action because they "further[ed] the danger [that] Mr. Duerson posed to T.D." *See id.* The same is true of Ms. Connell's post-placement recommendations in this case.[13]

_____

[13]Although the affirmative conduct requirement is often characterized as a "precondition" to the six-factor test identified above, *see, e.g.*, *Estate of B.I.C.*, 761 F. 3d at 1105, defendants argue that plaintiffs' failure to allege any affirmative conduct on the part of Ms. Connell is dispositive of the first and third factors of the six-factor test. *See* Docket No. 70 at 6. Because the Court concludes that plaintiffs have alleged affirmative conduct, and defendants do not raise any other arguments with regard to the first and third factors, the Court finds those factors satisfied for purposes of the motion to dismiss. Whether the allegations of affirmative conduct are borne out through

On the other hand, the Court is unpersuaded by plaintiffs' effort to predicate liability on Ms. Connell's "affirmative acts" of (1) "engag[ing] in purposeful manipulations of the complaint system to avoid protective regulatory deadlines" and (2) telling other individuals concerned about Angel's well being that she was "conducting an investigation." Docket No. 104 at 3-4. The Tenth Circuit has repeatedly stated that case workers who have no role in a child's initial placement have "no constitutional duty to rescue." *Currier*, 242 F.3d at 921; *see also Hubbard v. Oklahoma ex rel. Okla. Dep't of Human Servs.*, 2018 WL 6822285, at *11 (10th Cir. Dec. 28, 2018) (unpublished) (explaining that, if "the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed" (internal quotation marks omitted)).[14] Moreover, a failure to adequately investigate complaints of child abuse is not sufficient, standing alone, to give rise to liability under the Fourteenth Amendment. *See Matthews v. Bergdorf*, 889 F.3d 1136, 1151 (10th Cir. 2018) (finding that allegations regarding caseworkers' "failure to properly investigate and process reports of child abuse and neglect" did not "give rise to a claim under the state-created danger exception because they [did] not include any allegation of affirmative conduct");

---

discovery is an issue that may arise in subsequent pleadings.

[14]This rule does not apply when a child remains in the legal custody of the state post-placement. Under such circumstances, a "special relationship exists between the State and foster child, which triggers an accompanying, continuing duty imposed on state custodial officials thereafter – not a duty limited to only the specific officials who executed the placement of the child." *Schwartz v. Booker*, 702 F.3d 573, 581 (10th Cir. 2012). Here, however, plaintiffs allege that "Onesia Najera was given custody of [Angel] by Jefferson County" in August 2005. Docket No. 103 at 2, ¶ 2.

*Estate of B.I.C.*, 761 F.3d at 1107-08 (finding that allegations that caseworker had (1) refused to accept evidence of abuse, (2) refused to return police phone calls, (3) told grandparents that "any abuse of the children was not her issue," and (5) misrepresented to grandfather that she had been inside the home to investigate did not demonstrate affirmative conduct sufficient to confer liability under state-created danger theory).  Plaintiffs allege that Ms. Connell engaged in affirmative conduct by manipulating the complaint system and misrepresenting to others that she was conducting an investigation; however, such acts are part and parcel of her failure to investigate.  *See, e.g.*, *id.* (holding that law did not clearly establish that caseworker had engaged in affirmative conduct by failing to substantiate abuse and lying to grandfather that she had been inside the father's home to investigate complaints); *Hurst v. Madera*, No. 16-cv-01914-KMT, 2018 WL 684769, at *2-3, *9 (D. Colo. Feb. 2, 2018) (finding that complaint did not allege any affirmative conduct for purposes of state-created danger theory even though caseworker had fraudulently noted in a report that she had visited the child and her mother on two occasions and improperly designated the family as "Moderate Risk").  Moreover, the Tenth Circuit has rejected the argument "that liability can be predicated on a misrepresentation that causes others to lower their guard and not seek protection by other means."  *Estate of B.I.C.*, 761 F.3d at 1108.  Although the court suggested in *Currier* that "the state can be [held] liable when it affirmatively places private citizens in harm's way by removing what would otherwise be safety valves" or by "cutt[ing] off potential sources of private aid," 242 F.3d at 922, *Currier* involved allegations that a caseworker had instructed the mother of abused

28

children to stop reporting the abuse. *Id.* at 921. As relevant to this case, the Tenth Circuit has since declined to extend the principles announced in *Currier* to false "assurances of protection from the State." *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 925 (10th Cir. 2012) (finding that hospital's false assurances that patient would receive constant supervision during stay did not constitute affirmative conduct giving rise to constitutional liability); *see also Estate of B.I.C.*, 761 F.3d at 1108 (relying on *Gray* to hold that caseworker's misrepresentation to grandfather that she had visited home to investigate complaints of child abuse did not constitute "affirmative act" sufficient to confer liability). Because Ms. Connell's alleged misrepresentations that she was conducting an investigation are analogous to the "false assurances" in *Gray* and *Estate of B.I.C.*, they are insufficient under Tenth Circuit precedent to confer constitutional liability.

Turning to the remaining factors applicable to the state-created danger claim, defendants argue that plaintiffs have failed to allege facts showing that the risk to Angel was obvious or that Ms. Connell knew of the risk. Docket No. 70 at 7. The Court disagrees. The complaint is replete with allegations showing that Ms. Connell received "numerous serious complaints of abuse from family members, neighbors, schoolteachers, police, and the children themselves." Docket No. 104 at 5; *see also* Docket No. 103 at 7, 9, 11-12, 14-15, ¶¶ 31, 38, 54-55, 65-68, 71, 85, 89. [15] Additionally, Ms. Connell personally observed that Ms. Najera's home contained inadequate food, that Angel appeared underweight, and that Ms. Najera consistently

_____

[15]These paragraphs represent only a small part of the allegations pertaining to complaints of child abuse.

missed her mandated drug testing appointments.  *See id.* at 12, 18-19, ¶¶ 74, 104-08.

Defendants argue, without providing any support, that plaintiffs' allegations are

insufficient because they "indicate that the only knowledge [Ms. Connell] had consisted

of *reports of allegations* by third parties."  Docket No. 70 at 8.  In both *Currier* and *T.D.*,

however, the Tenth Circuit determined that caseworkers acted in conscious disregard of

a known or obvious risk based, among other things, on their failure to investigate third-

party reports of child abuse.  *See T.D.*, 868 F.3d at 1213 (noting allegations of abuse by

school officials and T.D.); *Currier*, 242 F.3d at 919-20 (noting mother's allegations that

father and father's girlfriend were abusing children).  Moreover, Ms. Connell's

knowledge of the risk to Angel was not based solely on third-party reports.  As noted

above, Ms. Connell personally observed a lack of food in Ms. Najera's house, Angel's

underweight appearance, and Ms. Najera's failure to comply with instructions from the

state.  The Court finds plaintiffs' allegations sufficient to demonstrate a known or

obvious risk.

Plaintiffs have also alleged facts that, if true, would demonstrate conscience-

shocking conduct.  In evaluating whether particular conduct rises to the level of a

substantive due process violation, courts consider "(1) the general need for restraint; (2)

the concern that § 1983 not replace state tort law; and (3) the need for deference to

local policy decisions impacting public safety."  *Currier*, 242 F.3d at 920.  To establish

conscience-shocking behavior, "the plaintiff must demonstrate a degree of

outrageousness and a magnitude of potential or actual harm that is truly conscience

shocking."  *Uhlrig*, 64 F.3d at 574.  Ordinary negligence will not suffice.  *See Ruiz*, 299

F.3d at 1184.

The Court finds that plaintiffs have met their burden at the pleading stage. In *Currier*, the Tenth Circuit determined that, "[i]n light of the initial information [the defendant] had about [the father's] financial irresponsibility, and in light of the numerous bruises and allegations of abuse, [the defendant's] failure to investigate the bruises and allegations and his subsequent responsibility for the court order granting [the father] legal custody could be conscience shocking, depending, of course, on further context as provided by discovery." 242 F.3d at 920. The facts asserted in this case are at least as conscience-shocking as those in *Currier*. Plaintiffs have alleged that, despite reports of serious child abuse and neglect by family members, teachers, neighbors, and the children under Ms. Najera's care, Ms. Connell intentionally manipulated JHS's complaint filing system to extend the deadlines applicable to investigations and to avoid having to conduct a timely investigation into the conditions in Ms. Najera's home. In addition, Ms. Connell affirmatively recommended that Angel remain in Ms. Najera's custody even though she knew that Ms. Najera had consistently refused to comply with drug testing requirements. Such conduct rises above the level of ordinary negligence, especially considering the fact that Angel had severe physical and developmental disabilities that made him entirely dependent on others for around-the-clock care. *See* Docket No. 103 at 6, ¶ 27; *see Currier*, 242 F.3d at 920 (noting that courts should consider the "cumulative impression of [a defendant's] conduct").[16]

_____

[16]The Court may consider Ms. Connell's failure to investigate complaints of child abuse as part of the danger-creation analysis. As the Tenth Circuit explained in *T.D.*, "during the time [a defendant] engage[s] in conduct that affirmatively contribute[s] to danger creation, all of the defendant's conduct tending to do so – including a failure to

## 2. Clearly Established Law

Because plaintiffs have alleged a violation of Angel's substantive due process rights under the Fourteenth Amendment, the Court must determine whether Angel's rights were clearly established at the time of the alleged violation. *See T.D.*, 868 F.3d at 1220.

A plaintiff may show clearly established law by citing "a Supreme Court or Tenth Circuit decision on point" or by demonstrating that "the clearly established weight of authority from other courts . . . have found the law to be as the plaintiff maintains." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (internal quotation marks omitted). While "a plaintiff need not show the very act in question previously was held unlawful in order to establish an absence of qualified immunity," *id.*, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). In evaluating whether a plaintiff has met this burden, the Supreme Court has repeatedly cautioned courts "not to define clearly established law at a high level of generality." *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1776 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Thus, the clearly established law "must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552.

The Court finds the Tenth Circuit's decision in *T.D.* to be determinative of the clearly established law analysis in this case. *T.D.* involved facts similar to those

---

investigate – is relevant" to the danger-creation analysis. 868 F.3d at 1232-33.

presented here: a social worker for the Denver Department of Human services failed to investigate allegations that T.D.'s father was abusing him, despite being on notice of evidence suggesting abuse, and further recommended, post-placement, that T.D. remain in his father's custody. *See T.D.*, 868 F.3d at 1213 (summarizing the factual similarities between T.D.'s case and *Currier*). The Tenth Circuit held that it was clearly established as of the court's decision in *Currier*, that (1) a caseworker's post-placement recommendation that a child remain in the custody of an abusive relative constitutes an affirmative act sufficient to confer liability under the danger-creation theory; (2) the facts alleged in *T.D.* were sufficient to demonstrate conscious disregard of a known and substantial risk; and (3) the conduct by the social worker, taken as a whole, shocked the conscience and amounted to a violation of T.D.'s substantive due process rights under the Fourteenth Amendment. *See T.D.*, 868 F.3d at 1226 (noting that *Currier* shows that "post-placement conduct may be considered for a danger-creation claim provided it is 'affirmative'" and holding, based on that rule, that social worker's post-placement recommendation that T.D. remain in his father's custody constituted an affirmative act sufficient to confer liability), 1231 (discussing *Currier*'s finding that the failure to investigate evidence of potential abuse "created or increased the children's vulnerability to the danger" and "placed the children at an obvious risk of serious, immediate, and proximate harm"), 1232 (finding that social worker's conduct resembled that found to be conscience-shocking in *Currier* in light of "her awareness of and failure to investigate evidence of potential abuse" and "her responsibility for T.D.'s being placed and remaining in Mr. Duerson's home"). Given the substantial factual

similarities between this case and *T.D.*, the Court likewise finds that *Currier* was sufficient to place any reasonable caseworker in Ms. Connell's position on notice that her failure to investigate allegations of child abuse, coupled with her affirmative recommendations that Angel remain in his grandmother's home, violated Angel's substantive due process rights. Accordingly, Ms. Connell is not entitled to qualified immunity with respect to plaintiffs' substantive due process claim.

### E.  Governmental Immunity

Defendants assert that the wrongful death claim against Ms. Connell is barred by the Colorado Governmental Immunity Act ("CGIA") because plaintiffs have failed to allege facts showing that Ms. Connell engaged in willful and wanton conduct. Docket No. 70 at 10.

Because wrongful death claims are derivative, *A.B., by Ybarra v. City of Woodland* Park, 174 F. Supp. 3d 1238, 1251 (D. Colo. 2016), they are "subject to the same defenses available to the underlying claims." *Elgin v. Bartlett*, 994 P.2d 411, 416 (Colo. 1999). In this case, plaintiffs predicate the wrongful death claim on a negligence theory of liability. *See* Docket No. 103 at 57-58, ¶¶ 333-35, 337. Under the CGIA,

> [a] public employee shall be immune from liability in any claim for injury, whether brought pursuant to this article, . . . the common law, or otherwise, which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing such injury was willful and wanton . . . .

Colo. Rev. Stat. § 24-10-118(2)(a).

Defendants argue that plaintiffs have not alleged willful and wanton conduct

because Ms. Connell's failure to investigate the complaints of child abuse merely demonstrates "bad judgment, which is not sufficient" to satisfy the "willful and wanton" standard under the CGIA. Docket 70 at 11. Plaintiffs respond that Ms. Connell's "purposeful procedural manipulations" in the face of an obvious and serious risk to Angel rise to the level of willful and wanton conduct. Docket No. 104 at 9.

While the CGIA does not define the phrase "willful and wanton," *Moody v. Ungerer*, 885 P.2d 200, 205 (Colo. 1994), Colorado courts have often sought guidance from Colorado's exemplary damages statute, which describes willful and wanton conduct as conduct "purposefully committed which the actor must have realized as dangerous, done needlessly and recklessly, without regard to consequences, or of the rights and safety of others." Colo. Rev. Stat. § 13-21-102(1)(b); *see also Dahn v. Adoption Alliance*, 164 F. Supp. 3d 1294, 1320 (D. Colo. Feb. 17, 2016), *rev'd in part on other grounds sub nom. Dahn v. Amedei*, 867 F.3d 1178 (10th Cir. 2017); *Moody*, 885 P.2d at 205. The Colorado Supreme Court has also recently stated that, regardless of the precise definition used, "willful and wanton" always denotes "a conscious disregard of the danger." *Martinez v. Estate of Bleck*, 379 P.3d 315, 323 (Colo. 2016) (surveying various definitions of "willful and wanton" and determining that "all share a common feature – namely, a conscious disregard of the danger").

Taking the facts asserted in the complaint as true and drawing all reasonable inferences in plaintiffs' favor, the Court finds that plaintiffs have sufficiently alleged willful and wanton conduct. As discussed above with respect to plaintiffs' § 1983 claim, plaintiffs have alleged facts showing that Ms. Connell was aware of numerous

complaints of serious abuse and neglect filed against Ms. Najera, Docket No. 103 at 7, 12, ¶¶ 37-38, 71, that she was aware those complaints had been designated "High Risk," *id.* at 11, ¶ 69, and that she had determined as early as February 2015 that a "Dependency and Neglect proceeding was required to protect Angel and the other children in Ms. Najera's care." *Id.* at 3, ¶ 6. Despite this knowledge, Ms. Connell intentionally manipulated the complaint filing system to extend the statutory deadlines applicable to her investigations and affirmatively recommended that Angel remain in Ms. Najera's custody. *Id.* at 13-14, 51, 52, ¶¶ 83, 293, 295, 298. Taken together, these allegations demonstrate a conscious disregard of a serious risk of harm to Angel, one that was realized when Ms. Najera left him alone in the bathtub on May 5, 2015. *Compare Castaldo v. Stone*, 192 F. Supp. 2d 1124, 1141 (2001) (finding no indication of willful or wanton conduct where, although defendants could have done more to investigate the actions of the perpetrators of a school shooting, they took action regarding the information they had been given). The Court therefore finds that the CGIA does not entitle Ms. Connell to dismissal of the wrongful death claim.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that County Defendants' Motion to Dismiss Second Amended Complaint and Jury Demand [Docket No. 70] is **GRANTED** in part and **DENIED** in part. It is further

**ORDERED** that the second claim for relief asserted by plaintiff The Estate of Angel Goodwin is dismissed without prejudice as to defendant Jefferson County Human

Services.  It is further

**ORDERED** that the second claim for relief asserted by plaintiff The Estate of

Angel Goodwin is dismissed with prejudice as to defendant Board of County

Commissioners for Jefferson County, Colorado.  It is further

**ORDERED** that the third claim for relief asserted by plaintiff The Estate of Angel

Goodwin is dismissed with prejudice as to defendant Jefferson County Human

Services.  It is further

**ORDERED** that defendant Jefferson County Human Services is dismissed from

this lawsuit.  It is further

**ORDERED** that County Defendants' Objection to United States Magistrate

Judge's Order Re Motion to Stay Discovery [Docket No. 96] is **OVERRULED** as moot.


DATED March 12, 2019.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
Chief United States District Judge